**CAPITAL CITY PUBLISHING CO., Plaintiff,**

v.

**TRENTON TIMES CORP., et al., Defendants.**

**Civ. No. 83–950.**

United States District Court, D. New Jersey.

Nov. 9, 1983.

Gerald A. Hughes, Trenton, N.J., Wachtell, Lipton, Rosen & Katz by Herbert M. Wachtell, Douglas S. Liebhafsky and Eric M. Roth, New York City, for plaintiff.

Crummy, Del Deo, Dolan & Purcell by Michael R. Griffinger, Newark, N.J., and Wildman, Harrold, Allen & Dixon by Arnold B. Calmann and Ann C. Petersen, Chicago, Ill., for defendant Audit Bureau of Circulation.

Baker & Hostetler by Jonathan E. Thackeray and John M. Gherlein, Cleveland, Ohio, for defendant Trenton Times Corp.

## OPINION OF THE COURT

HAROLD A. ACKERMAN, District Judge.

This is an action brought by the plaintiff, Capital City Publishing Company, Inc., against the defendants, Trenton Times Corporation, and the Audit Bureau of Circulations (ABC). Plaintiff is the publisher of the Trentonian, a daily newspaper, which competes with the Trenton Times, published by Defendant Trenton Times Corporation.

The two newspapers allegedly compete intensely for the sale of print advertising in the greater Trenton metropolitan area, the sale of print advertising being the principal source of revenue for both papers.

A newspaper's market share of paid circulation has a direct bearing on its ability to sell print advertising, and this is allegedly particularly so in the intensely competitive Trenton market. Generally speaking, the higher these circulation figures are, the higher the paper's advertising revenue. The paid circulation figures for both the Trentonian and the Trenton Times have been audited and published for many years by the defendant, ABC.

ABC is a not-for-profit membership organization which, *inter alia*, conducts newspaper and magazine circulation audits, and publishes the circulation data of its publisher members. ABC is the only entity in the country which regularly conducts such audits, and its members include nearly every paid circulation newspaper in the U.S. Because of its allegedly key role as arbiter of the paid circulation figures claimed by the Trentonian and the Trenton Times, plaintiff alleges that ABC effectively has the power to control their financial condition. Specifically, plaintiff's complaint alleges, *inter alia*, that ABC and the Times have conspired together in violation of federal and state anti-trust laws to publish wrongfully inflated circulation figures for the Times. Plaintiff alleges that although aware that these figures are false, Defendant ABC has continued to publish them, and has ignored plaintiff's requests for a reasonable audit of the Times figures. Based on these allegations, plaintiff seeks injunctive relief and damages from both defendants.

Plaintiff alleges jurisdiction based upon 28 U.S.C. Section 1337, and 15 U.S.C. Section 15, as well as the doctrine of pendent jurisdiction.

This matter was first scheduled to be before me upon the application by plaintiff Capital City for a preliminary injunction which was scheduled to be held on May 23, 1983. To prepare for this hearing, I ordered that expedited discovery be commenced. Pursuant to an agreement among the parties that defendants would not publish or release certain circulation figures of the Times without 30 day's prior notice to plaintiff, on June 7, 1983, I ordered that the hearing on this application be adjourned *sine die.*

Upon motion of Trenton Times, I disqualified plaintiff's counsel by order dated June 1st, 1983. All pending motions were also then adjourned to allow plaintiff time to retain new counsel or to appeal my order. Plaintiff thereafter retained new counsel, the firm of Wachtell, Lipton, Rosen and

Katz, and filed an amended complaint on July 18, 1983.

This matter is presently before me on four motions: first, Defendant ABC's Rule 12(b)(6) motion to dismiss plaintiff's complaint; second, Defendant Trenton Times' 12(b)(6) motion to dismiss certain counts of plaintiff's complaint, which has been referred to as the Times' "piggy-back" motion, since it relies upon ABC's arguments; third, Defendant ABC's motion to dismiss or stay proceedings; and fourth, Defendant Trenton Times' motion for a preliminary injunction.

I will address each of these motions in turn. I note that by letter dated September 30, 1983, the plaintiff withdrew without prejudice its motion to hold the defendant Trenton Times, in contempt. I first turn to Defendant ABC's Rule 12(b)(6) motion to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted.

A Rule 12(b)(6) motion is, of course, addressed to the legal sufficiency of the complaint. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only that such a complaint include " 'a short and plain statement of the claim,' that will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), *quoting* Rule 8(a)(2). As Chief Judge Seitz has stated, "It is not necessary to plead evidence, nor is it necessary to plead the facts upon which the claim is based." *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 446 (3d Cir.1977).

Thus, in deciding a motion to dismiss brought pursuant to Rule 12(b)(6), "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley* 355 U.S. at 45–46, 78 S.Ct. at 101–102.

Further, I must be "extremely liberal in construing anti-trust complaints" for the purposes of such a motion. *See Knuth v. Erie-Crawford Dairy Cooperative Associ-*

*ation*, 395 F.2d 420, 423 (3d Cir.1968). As Justice Marshall noted in *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976), "... in anti-trust cases where 'the proof is largely in the hands of the alleged conspirators,' *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), dismissals prior to giving the plaintiff ample opportunity for discovery should be granted sparingly." Justice Marshall added in the next sentence that this was a "concededly rigorous standard." 425 U.S. at 746, 96 S.Ct. at 1853. The Federal Rules provide for "simplified 'notice pleading'" and "reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome, and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley* 355 U.S. at 47–48, 78 S.Ct. at 102–103.

Applying this standard, and for the reasons which follow, I find that I cannot conclude that plaintiff could prove no set of facts in support of its claim which would entitle it to relief.

The gravamen of plaintiff's complaint is that the defendants Times and ABC, acting in concert, have engaged in a scheme, the object of which is to knowingly publish false and inflated circulation figures for the Defendant Times to the detriment of the Plaintiff Trentonian, and of competition in the Trenton, New Jersey newspaper advertising market. Plaintiff alleges that Defendant ABC has ignored repeated complaints by the plaintiff about these false circulation figures, and has ignored the requirements of its own by-laws and rules by failing to conduct suitable audits of these figures. Further, the Defendant ABC has allegedly released these false figures and audit reports knowing that the circulation figures, if published, would be relied upon by advertisers and newspapers alike in connection with the purchase and sale of newspaper advertising in the greater Trenton metropolitan area.

Given the unique status of Defendant ABC, as the sole auditor of paid circulation figures, both the plaintiff Trentonian and Trenton-market advertisers have had no choice but to rely, and plaintiff asserts, have in fact relied upon the false circulation figures for the Defendant Times published by it and Defendant ABC. The dual effect of defendant's conduct, plaintiff contends, has been a loss to the plaintiff of advertising revenue, profits and goodwill, and loss or "suppression" of competition in the Trenton print advertising market.

Specifically, plaintiff's complaint is organized as follows. First, Counts 1 through 3 of the complaint allege various violations of the Sherman Act, based on the foregoing facts. Count 1, alleged only against Defendant Times, charges that it has attempted to monopolize the newspaper advertising market by this and other conduct. Because this count is directed only against the Defendant Times, it is not a part of this motion.

Count 2 charges that both Defendants Times and ABC were engaging in a combination and conspiracy to restrain and monopolize interstate trade and commerce in the sale of print advertising, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. Sections 1 and 2.

Count 3, directed against Defendant ABC only, charges that it constitutes a combination in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

Counts 4, 5 and 6 allege the same or parallel types of anti-trust violations as do Counts 1, 2 and 3, respectively, but allege that such conduct violates the New Jersey Anti-Trust Act, N.J.S.A. Section 56:9–1, *et seq.*

Of the remaining eight claims, four are directed against the Defendant ABC: first, negligent misrepresentation, Count 11; second, breach of contract, Count 12; third, negligence, Count 13; and fourth, conspiracy to disparage, defraud, violate the New Jersey Consumer Fraud Act, and commit tortious interference with prospective business advantage, which is Count 14. The

first three of these are asserted against ABC alone. The fourth is asserted against both ABC and the Times.

The remaining four claims are asserted against the Defendant Times alone, and thus are again not the subject of this motion: first, disparagement, Count 7; second, fraud, Count 8; third, tortious interference with prospective business advantage, Count 9; and fourth, unlawful practices under the New Jersey Consumer Fraud Act, which is Count 10.

The complaint seeks compensatory and statutory damages against both Defendants ABC and the Times, as well as injunctive relief, including an injunction against ABC's publication of any circulation figures with respect to the Defendant Trenton Times, unless such figures have been verified by an independent auditor approved by the Court.

I will examine first the legal sufficiency of plaintiff's federal Sherman Act claims. As Judge Gibbons has stated in *Martin v. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978), "In order to sustain a cause of action under Section 1 of the Sherman Act, the plaintiff must prove: one, that the defendants, combined or conspired among each other; two, that the combination or conspiracy produced adverse anti-competitive effects within relevant product and geographic markets; three, that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and four, that the plaintiff was injured as a proximate result of that conspiracy."

More recent cases have clarified the law by holding that to successfully establish a claim under Section 1 of the Sherman Act, a plaintiff must prove either anti-competitive effect, or unlawful purpose. *McClain v. Real Estate Board of New Orleans*, 444 U.S. 232, at 243, 100 S.Ct. 502 at 509, 62 L.Ed.2d 441 (1980); *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 892 n. 17 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

Defendant ABC argues that the complaint is deficient as to each of these elements. I disagree.

■ First, it is undisputed that the complaint explicitly alleges in paragraph 28 that "Defendants ABC and the Times have combined and conspired to restrain and monopolize interstate trade and commerce in the sale of print advertising in violation of Sections 1 and 2 of the Sherman Act...." *See also* paragraph 31. Further, as Defendant ABC notes, the complaint goes on to detail the alleged time period of the conspiracy, its object or purpose, which was to "eliminate competition in the sale of print advertising in the greater Trenton metropolitan area by draining advertising revenue from the competitors of the Times, including the Trentonian," as well as certain actions allegedly taken to effectuate the purposes of this conspiracy. These include ABC's failure to conduct a reasonable audit of Defendant Times' circulation figures, notwithstanding plaintiff's request and complaints in that regard, and ABC's knowing publication of false circulation figures for the Defendant Times and its representation that they were accurate, notwithstanding its knowledge that they were false.

Contrary to ABC's contentions, I find that this satisfies plaintiff's burden at this stage of the proceedings. Plaintiff has alleged the existence of a conspiracy with a unity of purpose, and has identified its parties and time, as well as the actions allegedly taken to effectuate it. No further specificity is required in the complaint. *See Leeward Petroleum, Ltd. v. Mene Grande Oil Co.*, 415 F.Supp. 158, a very instructive opinion by Chief Judge Latchum in the District of Delaware, 1976; and I find that the facts alleged do give rise to an inference supporting the existence of the conspiracy. *See McKnight v. Southeastern Pennsylvania Transit Authority*, 583 F.2d 1229, 1235–1236 (3d Cir.1978).

■ I find unconvincing ABC's assertion that the allegations of the complaint do not support any inference that there was a unity of purpose or common design be-

tween Defendants ABC and the Trenton Times Corporation. The factual circumstances alleged in the complaint, which for the purposes of this motion I must accept as true, compel the conclusion that the defendants acted in concert to publish false circulation figures as means to suppress competition in the Trenton print advertising market.

Plaintiff's complaint clearly alleges that, one, the Times knowingly furnished false circulation figures to Defendant ABC, and two, ABC published those figures and represented to the public that they were accurate despite the fact that it actually knew that the figures were false. Further, the complaint suggests that neither party could accomplish the scheme without the other. On the basis of these allegations, the inference of concerted action to publish false circulation figures is inescapable.

■ I note that it is well-settled that the very nature of conspiracies require that their existence be proven entirely by circumstantial evidence. *See, e.g., Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969).

■ Next I find that plaintiff's allegations regarding anti-competitive effect are sufficient. Plaintiff's complaint specifically alleges in paragraphs 28 and 30 that:

"... defendants have engaged in an agreement and concert of action designed to eliminate competition in the sale of print advertising in the greater Trenton metropolitan area by draining advertising revenue from the competitors of the Times, including the Trentonian, through the publication by ABC of grossly inflated circulation figures for the Times," and

"... the effect of the combination and conspiracy has been and will continue to be the suppression of competition with respect to the sale of print advertising in the greater Trenton metropolitan area, including competition by the Trentonian."

Further, plaintiff notes in paragraphs 11 and 12 that an analysis of the market shares figures for the greater Trenton print advertising market indicate that there are only two major competitors in that market, plaintiff and Defendant Times. Given that print advertising constitutes the principal source of revenue for these newspapers, and that, as an economist might say, advertising revenue is "highly elastic" in relation to circulation changes, plaintiff points to the extreme effect on competition which has allegedly resulted from defendants' conspiracy.

Plaintiff alleges that the demise of the Trentonian would create a virtual monopoly in the relevant market by the Defendant Times, and suggests that there is a "dangerous possibility" that this result will be achieved absent intervention by this Court. The complaint makes equally plain that the less significant vendors will therefore suffer injury to their competitive positions similar to the plaintiffs. I find that these allegations are sufficient to meet the "anti-competitive effect" element. *See Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), as well as the *Knuth* case, cited *supra*.

■ The Defendant ABC next contends that the complaint fails to allege any illegal object. As I have earlier indicated, Section 1 of the Sherman Act only requires either anti-competitive effect or illegal object to be alleged. Here, plaintiff has, however, clearly alleged both. Paragraph 31 of the complaint clearly indicates that the alleged purpose or object of the conspiracy is the elimination of competition in the greater Trenton print advertising market by improperly and wrongly draining advertising revenue from the Defendant Times' competitors. I find that this, too, is sufficient to survive this motion to dismiss.

■ Finally, Defendant ABC suggests that plaintiff has alleged insufficient facts regarding proximate cause. I find this argument wholly without merit. The complaint specifies the causal link between the alleged conspiracy to publish false circula-

tion figures and plaintiff's injury. ABC's suggestion that the complaint must detail specific advertisers and specific sales that have been lost is without support. *See, e.g., Greenville Publishing Co., Inc. v. Daily Reflector, Inc.,* 496 F.2d 391, 400 (4th Cir.1974). Thus, I find that plaintiff's complaint is sufficient to allege a conspiracy claim against Defendant ABC under Section 1 of the Sherman Act.

Count 2 of the plaintiff's amended complaint also contains a claim for "conspiracy to monopolize" interstate trade and commerce in the sale of print advertising in violation of Section 2 of the Sherman Act. It is well-settled that "the essential elements of a conspiracy to monopolize are (1) an agreement or understanding between two or more economic entities; (2), a specific intent to monopolize; and (3), the commission of an overt act in furtherance of the alleged conspiracy." *See Pontias v. Children's Hospital,* 552 F.Supp. 1352, 1377 (W.D.Pa.1982), *citing Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 709–710, 82 S.Ct. 1404, 1415–1416, 8 L.Ed.2d 777 (1962).

Defendant ABC argues that Count 2 of the complaint fails to allege a claim under Section 2 of the Sherman Act because it contains insufficient allegations as to each of these elements. I have already found that plaintiff has sufficiently alleged the existence of an agreement between defendants ABC and the Times, both of which are "economic entities" within the meaning of the Act. I therefore find this first element satisfied.

■ As to the element of specific intent, I find that it, too, has been sufficiently alleged. Paragraph 28 of the complaint alleges that defendants have "combined and conspired to restrain and monopolize interstate commerce in the sale of print advertising," while paragraph 31 further alleges that the agreement was "designed to eliminate competition in the sale of print advertising...." These assertions are sufficient to satisfy the requirement that specific intent be alleged. *See Knuth* at page 425. *See also Allied Electric Supply Co.*

*v. Motorola,* 369 F.Supp. 133 at 139 (W.D. Pa.1973).

■ Finally, as to the overt act requirement, Defendant ABC contends that this element is missing because the acts alleged in the complaint "are not in furtherance of anything prohibited by the anti-trust laws." In light of my determinations that the other two elements of a Section 2 claim have been adequately alleged, I find that paragraphs 17, 18 and 32 of the complaint fully satisfy this final requirement, and that therefore a claim alleging a conspiracy by Defendants ABC and the Times to monopolize under Section 2 of the Sherman Act has been sufficiently pled in the complaint.

■ Defendant ABC next argues that plaintiff's Section 1 Sherman Act "combination" claim against it in Count 3 fails to state a claim upon which relief can be granted. In this count, plaintiff alleges that ABC in and of itself constitutes such a combination. Defendant ABC contends that whether this claim against it is analyzed in terms of individual action by each of ABC's members or in terms of unified action as a single entity, the allegations are insufficient as a matter of law. Plaintiff in response argues that Defendant ABC as a membership trade organization is, as a matter of law, potentially liable for the anti-competitive consequences of its activity. In support of its argument, plaintiff cites a number of cases in which Section 1 claims were upheld against associations of competitors, and which recognize that such associations were combinations whose actions represented concerted activity. *See Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389; *Radiant Burners, Inc.,* cited *supra; Associated Press v. U.S.,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; *Cantor v. Multiple Listing Service of Dutchess County, Inc.,* 568 F.Supp. 424, 1983–1 Trade Cases (CCH), Paragraph 68,513, (S.D.N.Y.1983); *Marrese v. American Academy of Orthopaedic Surgeons,* 496 F.Supp. 236, at 341, (N.D.Ill.1980).

Legally, the allegations of Count 3 are troublesome. From the standpoint of withstanding a 12(b)(6) motion to dismiss, however, I find that plaintiff's allegations are sufficient, both as to its claim of unilateral action by Defendant ABC, and as to collective action by its members. Having found that plaintiff's federal anti-trust claims under the Sherman Act are sufficient to withstand Defendant ABC's Rule 12(b)(6) motion to dismiss, I turn next to consider plaintiff's state law claims.

■ Counts 5 and 6 of the complaint allege claims against ABC under the New Jersey Anti-Trust Act, as previously noted. These claims parallel the federal Sherman Act claims asserted in Counts 2 and 3, respectively. The New Jersey Anti-Trust Act expressly provides that it is to be construed in harmony with its counterparts in the federal statutes. N.J.S.A. 56:9–18. *See also State v. Lawn King, Inc.* 84 N.J. 179, 192, 417 A.2d 1025 (1980). I therefore conclude that plaintiff has also sufficiently alleged a claim against Defendant ABC under the New Jersey Anti-Trust Act.

Count 12 of the complaint alleges a state law breach of contract claim. Specifically, plaintiff's complaint alleges that both the Trentonian and Times entered into a membership agreement with Defendant ABC pursuant to which the newspapers on the one hand, and ABC on the other, agreed to abide by the Defendant ABC's by-laws and rules. These by-laws and rules in turn provide, *inter alia*, that each publisher member must submit to ABC semi-annually a true statement of its paid circulation figures, and that Defendant ABC must then conduct audits to verify those figures. This count of the complaint alleges that ABC materially breached the membership agreement, as well as the by-laws and rules, and the implied covenant of good faith by, among other things, (1), failing to

conduct proper audits of the Times circulation figures; (2), ignoring repeated complaints by the Trentonian that the Times figures had been improperly inflated; and (3), publishing false circulation figures for the Times which ABC represented as being accurate. Defendant ABC's sole contention as to this count is that plaintiff has not in fact performed its own obligations under the contract because it has not in fact followed the purportedly required dispute resolution procedure.

As the parties note, this contention is the subject of defendant's motion to dismiss or stay proceedings. In the context of this motion to dismiss under Rule 12(b)(6), however, I find ABC's argument to be without merit. As plaintiff notes, on a motion to dismiss for failure to state a claim, the only issue is whether the complaint pleads that plaintiff has complied with its own obligations under the contract. Paragraph 85 of the complaint alleges that "the Trentonian has fully performed all of its duties and obligations under the Capital City membership agreement, and the ABC by-laws and rules." This allegation, I find, is sufficient to withstand Defendant ABC's motion to dismiss.

The complaint next sets forth claims against ABC for both negligence and negligent misrepresentation on Counts 13 and 11, respectively. As to the first, Defendant ABC contends that a claim for simple negligence cannot lie against an auditor, suggesting instead that only a claim for negligent misrepresentation may be asserted. In support of this proposition, ABC cites *Rosenblum v. Adler,* 93 N.J. 324, 461 A.2d 138 (1983).[1]

Plaintiff in response argues that Defendant ABC owes each of its members a duty to perform the audits which it has undertaken to perform for its members with reasonable care. That duty, plaintiffs al-

---

1. In *Rosenblum,* plaintiffs, two individual investors, brought an action against Defendant Touche Ross & Co., a partnership of auditors, as well as against the individual partners, alleging that they had been injured by Defendant Touche Ross's negligent preparation of an audit of the financial statements by Giant Stores Corpora-

tion. The New Jersey Supreme Court held that the defendant auditor had a duty to all those whom it should reasonably foresee as recipients from the company of the statements for its proper business purposes, not just those with whom it was in privity.

lege, was breached by ABC in, (1), its failure to conduct audits of the Times' circulation figures in a manner reasonably calculated to verify the accuracy thereof; (2), its failure to act upon information provided by plaintiff that the Times' circulation figures were inflated; and (3), its dissemination of these false figures.

■ Plaintiff further alleges that as a proximate result of these negligent acts plaintiffs suffered damages. I find that plaintiff's negligence claim is legally sufficient to survive this 12(b)(6) motion. The requirements of duty, breach, causation and damages are each properly alleged. *See*, for example, *Bratka v. Castles Ice Cream Co.*, 40 N.J.Super. 576, 123 A.2d 793 (App.Div.1956).

Further, Defendant ABC's reliance upon the *Rosenblum* case is, in my judgment, misplaced. *Rosenblum*'s expansion of an auditor's potential liability to include reasonably foreseeable third parties not in privity with the auditor-client relationship, cannot be read as a limitation on an auditor's potential liability to its own client, as is allegedly the case here. *See Levine v. Wiss & Company*, 190 N.J.Super. 335, 463 A.2d 396 as well as the Restatement of Torts, Section 324A.

The arguments raised by ABC as to plaintiff's claim in negligent misrepresentation are, I find, also without merit. As Justice Schreiber stated in the *Rosenblum* case, "Negligent misrepresentation is a legally sound concept. An incorrect statement negligently made and justifiably relied upon may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance." 93 N.J. at 334, 461 A.2d 138.

■ ABC contends that plaintiff did not in fact rely upon the accuracy of the Times' circulation figures as audited by ABC. Paragraph 74 of the plaintiff's complaint specifically alleges, however, that "the Trentonian and various advertisers have relied upon and continued to rely on" these figures. On a 12(b)(6) motion such as this, I need not look any further to conclude

that plaintiff has sufficiently alleged a claim under negligent misrepresentation.

■ Finally, Count 14 of plaintiff's complaint alleges a conspiracy to disparage, defraud, violate the Consumer Fraud Act and commit tortious interference. As to this count, I find that plaintiff has adequately alleged the existence of a conspiracy between Defendants ABC and the Times in, for example, paragraphs 28 and 31, and that under the *Pinkerton* doctrine, the individual tort claims which were sufficiently alleged as against Defendant Times are also sufficiently alleged against Defendant ABC. *See Pinkerton v. U.S.*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Board of Education of Asbury Park v. Hoek*, 38 N.J. 213, 183 A.2d 633 (1962). I thus must conclude that Count 14 of plaintiff's complaint is also legally sufficient.

In sum then, I have found that each of plaintiff's complaints against Defendant ABC are legally sufficient to state a claim upon which relief can be granted. I must therefore deny ABC's Rule 12(b)(6) motion to dismiss.

Defendant Trenton Times has joined in Defendant ABC's Rule 12(b)(6) motion insofar as it is relevant to claims against the Times. Specifically, it has joined in the motion as to Counts 2, 5, 6 and 14 of plaintiff's complaint, relying entirely upon Defendant ABC's arguments. For reasons which I have just explained, I must also deny the Defendant Times' motion as to these counts.

The next matter before me is Defendant ABC's motion to dismiss or stay proceedings. Under ABC's laws and rules, several procedures exist to facilitate the resolution of disputes. Although Defendant ABC suggested at various times that plaintiff make use of these internal procedures, plaintiff has refused. Defendant ABC by this motion seeks to have this action dismissed or stayed, contending for various reasons that plaintiff is required to submit its claims to these internal procedures before it can invoke this Court's jurisdiction. For the reasons which follow, I disagree.

ABC's first argument is that plaintiff has failed to exhaust the relief available to it under ABC's by-laws and rules. Specifically, Defendant ABC contends that plaintiff, in becoming a member of ABC agreed "... to abide by all of the by-laws, rules and regulations of the Bureau and all amendments that may, in due form, he made thereto." These "by-laws, rules and regulations" provide three nonlitigious means for the resolution of member complaints regarding the accuracy of circulation figures: first, a "Reaudit Procedure" under Article B3.13 of the Rules; second, a "Special Investigation" procedure under Article 4.7 of the by-laws; and third, the filing, pursuant to Article 7.2 of the by-laws, of formal charges by one member against another, which triggers a hearing on the matter by the ABC Board of Directors. This hearing may result in the imposition of one of several sanctions, including censure, probation, or expulsion. ABC contends that these options provide relief which is parallel to that sought by plaintiff in this action, and that plaintiff is under a contractual obligation to invoke this "court of first resort"—meaning ABC's internal administrative procedures, —prior to filing a complaint in state or federal court.

■ As plaintiff points out, this assertion is simply incorrect. An examination of each of the three provisions reveals that they create remedies available at the *option* of the aggrieved member. Nothing in these provisions limits members to these remedies exclusively, or suggests in any way that they must be invoked or exhausted prior to a member's invocation of other external remedies such as litigation. Since there is no such contractual obligation on plaintiff's part to pursue any internal grievance procedure as its exclusive or first remedy, I note that plaintiff appears to be in compliance with the ABC membership requirements in this regard.

■ Defendant ABC further contends, however, that the action in essence involves the enforcement of ABC's by-laws, and that courts should not intervene in such matters. In support of this argument, ABC relies upon *Charles O. Finley & Co., Inc. v. Kuhn,* 569 F.2d 527 (7th Cir.1978), a case involving the issue of whether the Commissioner of baseball had the authority to disapprove professional baseball player assignments. Leaving aside the fact that the *Finley* case involved the somewhat unique area of professional sports generally, and the sport of baseball in particular, ABC's reliance on this principle is wholly misplaced, since plaintiff's complaint seeks relief which is in no way limited to enforcement of the ABC's by-laws and rules. As I have indicated several times, plaintiff is seeking relief which is beyond ABC's power to grant, namely monetary damages and injunctive relief from an alleged scheme of monopolistic practices and tortious business conduct involving both ABC and the Times. This, of course, is substantially more than and distinct from a request to correct inaccurate circulation figures, or even a request to sanction a member for having filed a false or fraudulent statement with ABC. Thus, I must find that the notion of judicial non-intervention in matters concerning the enforcement of the by-laws of a voluntary association, even if it is a valid principle under the common law has no applicability to this action.

ABC next argues that this court should defer to ABC's procedures, analogizing its internal remedies to arbitration or governmental administrative procedures. Once again, I find ABC's arguments unpersuasive. First, its analogy to the law governing deferral to arbitration is, in my judgment, fatally flawed by the undisputed fact that plaintiff never agreed to submit its dispute to arbitration. As plaintiff notes, it is well-settled that "arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *See United Steelworkers of America v. Warner & Gulf Navigation Co.,* 363 U.S. 574, at 582, 80 S.Ct. 1347, at 1352, 4 L.Ed.2d 1409.

Further, an agreement to arbitrate is never lightly inferred, with courts general-

ly requiring "a clear, explicit statement" to that effect. *See Old Dutch Farms, Inc. v. Milk Drivers and Dairy Employees, Local Union No. 584,* 359 F.2d 598, 603 (2nd Cir.), *cert. denied,* 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966). Here, plaintiff never expressly or impliedly waived any judicial remedies in favor of arbitration. In the context of arbitration, provisions akin to those found in the ABC by-laws and rules have been read to not impose binding obligations to arbitrate. *See,* for example, *Local 189, Service Employees' Union v. Scot Lad Foods, Inc.,* 513 F.Supp. 839 (N.D.Ill.1981).

■ Further, it is clear that at least a portion of plaintiff's claims could not be subject to an agreement to arbitrate any way, under the principle that anti-trust claims may not be the subject of arbitration. *See American Safety Equipment Corp. v. J.P. Maguire & Co.,* 391 F.2d 821 (2d Cir.1968).

ABC's administrative exhaustion analogy is similarly flawed. The administrative exhaustion doctrine requires deference to administrative remedies where there has been a legislative or judicial determination that a specific subject matter area should be entrusted to a governmental agency in order to "secure uniformity of administrative policy and disposition, expertness of judgment, and finality in determination ..." *See Aircraft and Diesel Equipment Corp. v. Hirsch,* 331 U.S. 752, at 767, 768, 67 S.Ct. 1493, at 1500, 1501, 91 L.Ed. 1796. Here these considerations can in no way be said to apply, given that ABC is a private corporation which is named as party defendant herein, and which could not in any event order the relief which plaintiff seeks. *See Glover v. St. Louis-San Francisco Railway Co.,* 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1968); *Clayton v. International Union,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981).

Finally, in considering Defendant ABC's request for a stay of proceedings, recent pronouncements by the United States Supreme Court have counselled caution in circumstances such as this. As Justice Brennan stated in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976), there exists a "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." For all of these reasons, I have determined to deny Defendant ABC's motion to dismiss or stay its proceedings.

The final motion before me in this matter is Defendant Trenton Times' motion for a preliminary injunction. By this motion, the Times seeks prohibitory relief against what it characterizes as plaintiff's further "misuse" of my order of June 7, 1983.

This order was entered with the consent of all parties. Its preamble recited *inter alia* the substance of an agreement among and between the parties, to wit, that various circulation figures from the Times would not be released without 30 day's prior notice to the plaintiff. Defendant Times alleges that shortly after this order was entered, two of plaintiff's agents began showing it to major advertisers in the Trenton market, claiming that the entry of the order indicated that this court had determined the Times' circulation figures to be fraudulent, or at least questionable.

The facts which the Defendant Times relies upon in bringing this motion are largely contained in the deposition testimony of Edward Hoffman, the Trentonian's publisher, and James Keller, the Trentonian's marketing director. This being so, the parties have relied upon the transcripts of these depositions, and certain other uncontested facts, in lieu of an evidentiary hearing on this motion.

The facts relevant to this motion are as follows: first, it is undisputed that the entry of the June 7, 1983 order in no way constituted a finding regarding the reliability or lack thereof of the Times' circulation figures. The plain language of the order itself suggests no such inference. No evidence having been presented, I not only did not, but obviously could not have commented on the accuracy of these figures.

During several sales presentations to advertisers, however, Messrs. Hoffman and Keller told the advertisers that the signing of the June 7th order demonstrated that the Times' circulation figures were false. For example, Mr. Keller testified as follows regarding a meeting he and Mr. Hoffman had with Sears executives at Sears headquarters:

"QUESTION: Did you bring any document with you?

"ANSWER: I'm sure we presented a court order at that second meeting.

"QUESTION: Why are you sure of that?

"ANSWER: Just because we did.

"QUESTION: Who presented it?

"ANSWER: Mr. Hoffman.

"QUESTION: When you referred to the court order, you were referring to the order regarding Times' circulation, right?

"ANSWER: Yes.

"QUESTION: Why was that brought up?

"ANSWER: Because we felt it was essential that we could establish that the Times was cheating or fraudulent, whatever, in their circulation. In other words, if the ABC's were out, circulation was very even. We thought that a true circulation figure on the Trenton Times by an independent audit would establish us being number one by a large majority in this market. So we thought it was essential to convey to them that the figures the Times was giving them were false.

"QUESTION: How did presenting the court order do that?

"ANSWER: The fact that it prohibited the Times from discussing any circulation after March 31, 1982, would give the assumption that the figures that were presented in December were false. In other words, this court order would say, there must be something wrong with those figures because they can't discuss them.

"QUESTION: Did you convey that to Mr. Stevenson or Kramer?

"ANSWER: Yes.

"QUESTION: Did Mr. Hoffman?

"ANSWER: Yes."

Mr. Keller testified that he made similar representations to other advertisers, including Cabot Advertising, National Co-op Couponing, and Hahne's Department Stores.

Plaintiff stresses that neither Mr. Keller nor Mr. Hoffman actually told advertisers that this court had made an explicit finding regarding the Times' circulation figures. As Mr. Hoffman testified, "I indicated that the order had been signed which prohibited the Trenton Times from giving any figures after September 30, 1982, and that in my opinion, there was enough evidence to justify the issuance of the order by the Court...." Mr. Hoffman did testify, however, that he had indicated to an advertiser that, "We believe there was evidence presented so that the judge would feel that the order should be invoked or placed into being." This incorrect view of the facts underlying the signing of the June 7th order stemmed, Mr. Hoffman explained, from his mistaken belief that certain affidavits regarding the Times' circulation practices had been presented to the Court, as well as his ignorance of the law regarding consent orders. He explained that, "As a layman ... I did not realize that a federal court would issue an order unless there was some reason for so doing..."

Following discovery that the June 7th order was being used by plaintiff in this matter, the Defendant Times sought emergent relief to halt this conduct. On August 15, 1983, the Times sought and obtained a temporary restraining order (TRO), from my colleague, Judge Debevoise, preventing the plaintiff from making any further statements or suggestions, and from using the June 7th order itself to suggest, that the June 7th order in any way reflects the court's opinion as to the validity or invalidity of the circulation figures of the Times.

A preliminary injunction hearing on this issue was scheduled for August 25, 1983.

A number of actions were taken by the plaintiff in response to the TRO. First, on August 18, 1983, Mr. Hoffman circulated to

all Trentonian employees a memorandum advising them of the entry of the TRO, and of their consequent obligations. Second, on that same day, the Trentonian advised its national advertising agency, Landon Associates, of the TRO, and that it, too, was to follow its dictates. Finally, on August 23, 1983, one day before my colleague, Judge Brotman, was scheduled to hold the preliminary injunction hearing on this issue, plaintiff sent out a letter to advertisers, allegedly in an attempt to "correct any misimpressions" which had been conveyed by Messrs. Hoffman and Keller.

Defendant Times suggests that this letter, while neutralizing some of the initial damage, leaves the reader with a replacement set of misimpressions concerning the meaning and effect of the June 7th order. This concern centers around plaintiff's *"res ipsa loquitur"* statement that the Defendant Times' agreement to withhold current circulation figures "in the face of the injunction motion ... speaks for itself."

Thereafter, the hearing on the Times' application for a preliminary injunction was adjourned by all parties and the TRO extended to remain in force until this matter could be heard.

It is well-settled in the Third Circuit that: "A preliminary injunction is not granted as a matter of right. *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120, 136 (3d Cir.) *cert. denied,* 449 U.S. 1014 [101 S.Ct. 573, 66 L.Ed.2d 473] (1980). It may be granted, however, if the moving party demonstrates both a reasonable probability of eventual success in the litigation and that the party 'will be irreparably injured *pendente lite* if relief is not granted.' *See* page 136 of the *Lilly* opinion; *Kennecott Corp. v. Smith,* 637 F.2d 181 at 187 (3d Cir.1980). The trial court may also consider the possibility of harm to other interested persons from the grant or denial of the injunction, as well as harm to the public interest. *Eli Lilly & Co.,* 630 F.2d at 136. The grant or denial of a preliminary injunction is committed to the sound discretion of the district

judge, who must balance all of these factors in making a decision."
*Kershner v. Mazurkiewicz,* 670 F.2d 440 (3d Cir.1982) (en banc).

▮▮▮▮ With this standard in mind, I turn first to consider the arguments of the parties regarding irreparable harm. As I have previously intimated, the burden rests on the party moving for preliminary injunctive relief to demonstrate that it will be irreparably injured if such relief is not granted. *See Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Coppers Co., Inc. v. Krupp-Koppers GmbH,* 517 F.Supp. 836, (W.D.Pa.1981). As Judge Garth noted in *Oburn v. Shapp,* 521 F.2d 142 (3d Cir.1975), "A finding of no irreparable harm is itself sufficient to uphold the district court's denial of a preliminary injunction as a proper exercise of discretion." *Id.* at 151 quoting *Commonwealth of Pennsylvania, ex rel. Creamer v. United States Department of Agriculture,* 469 F.2d 1387, at 1388 (3d Cir.1972). While "what may constitute irreparable harm in a particular case is, of course, dependent upon the particular circumstances of the case," *see Oburn* at 151, the moving party must show an "imminent threat" which is more than mere speculation or fear as to what may ensue in the future. *See Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 356 (3d Cir.1980); *Nissin Foods, U.S.A., Co., Inc. v. NLRB,* 515 F.Supp. 1154, 1156 (E.D. Pa.1981). Justice White, speaking for the Supreme Court in the *City of Los Angeles v. Lyons,* ── U.S. ──, ──, 103 S.Ct. 1660, 1668, 75 L.Ed.2d 675 (1983), noted that the required showing of irreparable injury "cannot be met where there is no showing of any real or immediate threat that the moving party will be wronged again."

For the purposes of this motion, I find that the Defendant Times has not met its burden of demonstrating irreparable injury for two reasons: First, I find that it has not demonstrated a likelihood that plaintiff would again misuse the June 7th order. While the uncontradicted evidence before

me suggests that both Mr. Keller and Mr. Hoffman conducted themselves improperly in their meetings with advertisers, there is nothing to suggest that they will again attempt to misrepresent or mischaracterize the proceedings in this matter, or, in particular, that they will utilize the June 7th order for competitive purposes. As to this issue I rely especially on the memorandum to all Trentonian employees and its advertising representative which clearly instructs them to refrain from any use of that order. Second, the injury alleged by the Times is essentially a loss of advertising revenue, and a consequent loss of profits. The Times has not alleged a loss of revenue or threat thereof sufficient to destroy it as an economic entity, nor has it alleged an irreversible loss of advertising goodwill.

I find, therefore, that the Defendant Times has not demonstrated that its injury is irreparable, since it appears that any harm which has been suffered can be undone by monetary remedies. *See Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, (5th Cir.1981); *Hummel v. Brennan*, 469 F.Supp. 1180 (E.D.Pa.1979). "The possibility that adequate compensatory or other corrective relief will be available at a later date in the ordinary course of litigation weighs heavily against the claim of irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974), *quoting Virginia Petroleum Job Association v. Federal Power Commission*, 259 F.2d 921, 925 (D.C.Cir. 1958).

■ I similarly find that the Defendant Times has not demonstrated a likelihood of ultimate success on this issue. Assuming that Defendant Times' application is based on an allegation of fraud, I cannot find on the facts before me that it was likelier than not that either Mr. Keller or Mr. Hoffman acted with the requisite scienter. While it is possible to ascribe to either or both an intent to mislead, it is equally likely, based on the evidence before me on this motion, that they made their statements on the basis of a combination of mistaken assumptions and overzealousness. Because proof of such an intent to mislead is an essential element of a fraud claim, I find that the Defendant Times has not met its burden on this issue as well.

Having found that the Defendant Times has shown neither that it will be irreparably injured *pendente lite* if relief is not granted, nor that it has a reasonable probability of eventual success on this claim, I must deny its application for a preliminary injunction.

This determination is, of course, not to be taken as a decision on the ultimate merits of any claim by any of the parties, but it is equally not to be understood as a condonation of Messrs. Keller and Hoffman's conduct.

As a final matter, I must address the question of the propriety of the "corrective" letters dated August 23, 1983 which were sent out by the plaintiffs to various advertisers. Plaintiff urges me to accept the fact that these letters were sent in good faith to resolve any misunderstanding that Hoffman and Keller may have created. In my opinion, however, the letters had a tendency to create new misimpressions concerning the import of the June 7th order. In light of the history of this case, I feel that institutionally and in the interest of fairness it is the obligation of both parties to set the record absolutely straight with all advertisers who may have been contacted by the plaintiff. It seems to me that the best modality to accomplish this is for the plaintiff and the Defendant Times to send a joint letter, approved by the Court, setting forth in clear and unmistakable terms the context and meaning of the June 7th order, and emphasizing that no inference regarding the validity of either party's circulation figures is to be drawn from it. Therefore, based on this Court's inherent power to protect and enforce its orders, I will order that this letter be prepared and sent out forthwith.

In sum then, I have denied Defendant ABC's Rule 12(b)(6) motion to dismiss plaintiff's complaint, and its motion to dismiss or stay proceedings. I have denied De-

fendant Times' 12(b)(6) motion to dismiss certain counts of plaintiff's complaint and its application for a preliminary injunction, and I have ordered that a joint letter be sent by plaintiff and Defendant Times regarding my June 7th order.